This is cause number 24-60035, M.K. v. Pearl River County School District. The appellant, obviously, is ready to proceed. May it please the Court, Becca Steinberg for Appellant M.K. You may proceed. There are two questions in this case. Does Title IX prohibit sexual orientation discrimination? And is there enough for a jury to find the harassment was severe and pervasive? Let's start with the first. Bostock held that it is impossible to discriminate against a person for being gay without discriminating against that person based on sex. That reasoning applies here, and here's why. First, Title IX's on-the-basis-of-sex language means the same thing as Title VII's because-of-sex language. That's because Title IX, like Title VII, imposes a but-for causation standard. Bostock held that when a sex discrimination statute uses a but-for causation standard, it bars sexual orientation discrimination. And throughout Bostock- It's written here as on-the-cause-of and based-on. It's really highly technical. I mean, it's a comment that's in your favor. Yes, Your Honor, and they're used consistently. It doesn't make a lot of sense to me, just common sense, that you would have, is there any reason to have two standards other than this highly technical interpretation of because or based on? No, there are not. Real clear, and arguably you can make a kind of philosophical argument that Greek philosophers could spend days on perhaps, but it doesn't seem particularly appropriate for the courts to put hairs like that and send one man to this and one man to that based on arcane interpretations. Correct, and that's why I think Bostock uses those phrases interchangeably throughout. We cite examples on page 22 of our opening brief at footnotes 3 and 4 where Bostock uses on the basis of and because of interchangeably. And in doing that, it followed a long line of both Title VII and Title IX cases that did the same thing. One thing that's not interchangeable is that this Title IX is spending clause legislation, and that is a material difference. How do you get around that? I would point to Jackson and the way that Jackson analyzes the spending clause. So it is true that under the spending clause there needs to be a clear statement, and what Jackson says is that, and this is at Penn site 182, funding recipients have been on notice that they could be subject to private suits for intentional discrimination. Pennhurst does not preclude private suits for intentional acts that clearly violate Title IX. Throughout Jackson's analysis, what it's looking at is whether Title IX clearly prohibits sex discrimination. Because it clearly prohibits sex discrimination and retaliation is a form of sex discrimination, therefore retaliation is covered. The same thing is true here. Because Title IX clearly prohibits sex discrimination and sexual orientation discrimination is a form of sex discrimination, sexual orientation discrimination is covered by the statute. And that's very clear under the but for causation standard. That is, take a materially identical boy and girl. A boy who is perceived to like boys is harassed, but a girl who is perceived to like boys is not. In that case, the only thing that you change between those two individuals is one is a boy and one is a girl. And as a result, that sexual orientation discrimination is sex discrimination. You're talking about bullying here is really what you're talking about, it seems to me. And so we come up and say you can bully anybody about anything other than you cannot call him queer even though he's not queer. I mean, that, and you put that to, at least have a judge that said that just doesn't sound right to people in Beale Platt, Louisiana. Great. So I guess turning to the facts of this specific case, whether this discrimination was both sex-based and severe and pervasive, there's a difference between a single insult or insults that aren't severe and pervasive enough to impact the educational environment and what we have here. So in a case like... How did it affect his education? It affected his education in two ways. The first way is that it happened in the classroom. So as he was sitting in math class, for example, the entire time behind him, IL was sitting behind whispering, calling him gay and gay boy. So it's different from a case like Sanchez where... But the teachers addressed it. Not in math class, Your Honor. I thought that's where the teacher called up and said, I don't want to hear this anymore. Correct. They discouraged him from reporting it by... No, no, no, no, no. The teacher said, I don't want to hear this anymore. And what MK said in his deposition, I thought, was... I interpreted that to mean she wanted him to stop and she wanted me to stop complaining about it. So it was kind of both ways. Correct. It was both ways. In other words, the teacher took action to say, stop doing it. But the action included both talking to the bully and talking to MK, or at least there's a triable issue of fact. And Davis... One thing that Davis wrote could rise to the level of deliberate indifference is discouraging the reporting. So even if the comment was directed at both the bully and MK, the fact remains that it discouraged him from reporting. Where is the case that says that rises to deliberate indifference? So the district court didn't reach deliberate indifference and the school district didn't brief it in this court. So if the court is interested in the deliberate indifference, the prong five of that standard, we would ask the court to remand so the district court could consider it in the first instance. Well, the district court didn't get there because the district court said it's not severe and pervasive. Correct. And so as to the severity and pervasiveness, right, so the district court analyzed prongs three and prongs four of that analysis and left prong five out. And so if the court is concerned about prong five, the district court should analyze it in the first instance. As to that, I mean, if the record is conclusive that there was no deliberate indifference because the teachers, I mean, that shows the teachers did something about it. And we don't, if we're talking about deliberate indifference, we're not talking about negligence. They should have done more. We don't like the way they did it. I mean, teachers are refereeing a whole lot, especially in middle school. So if they do something about it, that's not deliberate indifference. Two points on that, Your Honor. First is that the school district didn't raise it in this court. So I think that would counsel against this court reaching it. But second is that just doing something isn't enough when. Did they raise it in district court? Yes, Your Honor, but they didn't raise it. We can affirm on any basis that it was raised before the district court that's in the record, correct? Your Honor, as we point out in our reply brief, we don't think that raising it in a footnote is enough to preserve that argument on appeal. But on top of that. Raising it in a footnote and the district court never addressed it. Correct, those two. Factual determination is going to be addressed, and arguably it ought to be addressed in the first instance by the district court. Absolutely, Judge Graves. If the court is interested in it, I would say that in, you know, the assistant principal, who's the person with the authority to take corrective action, didn't do anything despite being on notice, both through the conversations with M.K.'s father and indicating in that conversation to M.K.'s father that he had already been aware of this consistent behavior. But the second way, going back to the severe and pervasive analysis, that M.K. was deprived of educational opportunities is that he was kicked out of school. He was kicked out of school for what he did. Yes, Your Honor. There's a dispute of fact as to what happened there. And, of course, that dispute of fact ought to go to the fact finder. It's not appropriately resolved at the summary judgment stage. But we think, quite frankly, either fact, either interpretation of those facts could give rise to deliberate indifference claim. Is that a fact? I'm sorry. No, go ahead. What I was going to follow up with is that the district court said that based on M.K.'s own undisputed testimony, he said he did it unintentionally, right, that when he exposed himself. That the school district found that he actually did it intentionally, and that's why they sent him to the alternative school or expelled him. I mean, in other words, what the district court said was his factual account just doesn't square. So there's a factual dispute in the record, and what both M.K. and his father testified to is that the assistant principal effectively browbeat M.K. saying, you're lying, you're lying, you're lying, you're lying. How does the fact that he exposed himself and was disciplined for that work in your favor? So the reason that that – so you might consider another example that's relatively common, where a girl is sexually assaulted, the school does nothing, and as a result this girl acts out because of the sexual assault. You're forgiving him for the conduct of exposing himself as irrelevant to the consideration that is involved in this case? No, Your Honor, but we think that's a question for the jury. And on top of that, the big concern is that what the school did consistently is they believed the bullies over M.K. They didn't respond appropriately to what happened, and when you had – How old are these children? They were in middle school. They were sixth grade. They were 10 and 11 at the time. 10 and 11 years old. So I think sixth graders are typically a little bit older, Your Honor, but we – There's a lot of case law, it seems to me, that is against or creates headwinds for you, and that is to get involved in the discipline of these children and ignoring the fact that children are going – 10, 11-year-old boys. I mean, the guy was not gay. I guess he was small. I don't know why they picked on him, but if you get into every time that the courts are going to get into every instance in which there's bullying in grammar school, I mean, it seems like we're overdoing it. Two points on that, Your Honor. First, the age and context, and second, why they picked on him. So for the age and context, Davis involved fifth graders who were younger than the students at issue here. And I think what Davis said when you're looking at the fact that you have to recognize that school children are different is that the context matters. And here, unlike a case like Sanchez, you had the bullying consistently happen in the classroom. So what might be normal – Most of the bullying wasn't even related to anything under any inference favorable to the plaintiff about sexual orientation. It was about playing video games badly. It was about being short. I have a claim about being short, too. So that was what happened in science class, but in math, band, and language arts, it was about being gay and involved the same bullies in the same temporal timeframe. In cases like – May I ask one question? Absolutely, because I have a few. So go ahead. I'll just ask one question. And that is, at what point does it become prohibited, unlawful discrimination for sixth graders to call each other queer or other kind of things? Because they chat back and forth all the time with each other in that kind of slang language. If it had just happened one time, is that a violation of Title IX? No, if it just happened one time, it would not be per Davis. It's a consequence. How many times has it got to happen, three or four? How many times has the school got to say – the school teacher got to say, y'all boys cut that out. I don't want to hear any more of it. I mean, has she got to say that every day, or has she got to say it – I mean, where is the legal line that prohibits the conduct of which you are suing on? Two points on that, Your Honor. The first is what the school teacher asked you. Again, that would be prong five, which doesn't go to severe and pervasive prong four of the test. But in terms of how often it has to happen, Davis says it's a constellation of factors. So here, what matters is that it's four against one. The number of students matter. It matters that it's happening in the classroom itself rather than just in the hallways or at recess. And it matters that it's happening consistently throughout the day from the beginning of the day. Used by the term constellation of factors. It doesn't seem like that's communicating a lot to the average teacher and superintendent and other people that have to supervise this kind of conduct. Here's my question, because I'm sorry. No, no, no. I don't think I heard one. I guess I'm more concerned about whether or not it actually interfered with – and I'm not sure what the correct language is – whether it interfered with his ability to get an equal education. Because it has to do that in order for your claim to be successful. Yes, Your Honor. So tell me what evidence there is that it interfered with – what's the phrase? Is it interfering with his ability to get an equal education? Something like that. The harassment was severe, pervasive, and objectively offensive, such that it effectively barred the victim's access to an educational opportunity or benefit. All right. So tell me how it barred his access to an educational opportunity or benefit. Because instead of being able to pay attention to what the teacher was saying, he was listening to students behind him tell him that he was gay. The student – the bullying was crazy. That's at RE83. It was overwhelming at RE83. That IL was – like all – he was trying to do something at all times. That's RE96. That kept him from being able to fully access the classroom experience. Yeah, but that ignores what commonly goes on in classes of that level. I mean, people are constantly asserting jokes, whispering, or whatever, that are going to interfere with the education that the classroom teacher is trying to convey. I mean, I just don't see that it has a peculiarity to support your case. The peculiarity is that this level of severity and pervasiveness was happening in the classroom itself rather than in the lunchroom or in the hallways in a case like Sanchez, which is where the harassment there happens. All right. Thank you, counsel. Your time has expired. Thank you. Lee. Good morning, Your Honor. May it please the Court. Jason Lee for the United States. Title IX bars discrimination based on sexual orientation because such conduct necessarily entails discrimination based on sex. That's true under Title VII. It's equally true under Title IX, which prohibits sex discrimination using materially identical language. Neither of the district court's basis for reaching a contrary conclusion withstands scrutiny, use of the phrase on the basis of, and issues of notice under the Spending Clause. Starting with the Spending Clause, I'd like to address the question that you raised, Judge Jolly, which pertains to how you analyze the Spending Clause under Title IX. And Jackson sets forth the proper analysis of that. Under Jackson, as repeated under Davis, intentional discrimination based on sex is clearly prohibited under the statute. Funding recipients have sufficient notice that that's prohibited. So that raises two questions. Is this cognizable discrimination, and is it on the basis of sex? Now, here you don't need to decide whether or not it's cognizable discrimination. We know that the type of discrimination alleged here is cognizable. Davis says so. So the only question is whether or not this type of conduct was done on the basis of sex. That's the same situation that the Supreme Court confronted in Jackson. There, a teacher was fired because he complained about sex discrimination in his classes, and the court considered whether or not that was conduct on the basis of sex. They said, yes, you're discriminating on the basis of the complaint. Here, it's the same thing. Whether or not the conduct alleged here, bullying on the basis of sexual orientation necessarily entails discrimination based on sex, we know that's right. We know that based on Bostock. I agree with your argument, which I don't disagree with particularly. But, I mean, you win your argument there, and you're just on first base. You've got two more bases at least to clear before you win or fail. Are you referring to the rest of the Davis standard or the spending clause? I'm talking about the facts, and I guess this is not your responsibility in terms of the argument here, to argue the facts. But you win your argument, and you've got a lot of loose strings handling before you get to victory in your case. The United States is only here to address the broad legal issue of whether or not discrimination based on sexual orientation necessarily entails discrimination based on sex. The causation error by the district court is a serious one. It's in direct conflict with this court's precedent. I think that's easily disposed of. This court has already held that on the basis of What's the precise holding of the district court on the point that you are arguing? I think on the causation issue, all parties seem to agree that the district court applied something more stringent than but-for causation. This court has already held in the disciplinary cases that a lower causation standard applies. Trudeau expressly applied but-for causation. Taylor-Travis rejected the proposition that a higher causation standard applies. That's foreclosed by precedent. The spending clause How would you articulate the causation that the district court applied? Sole or primary causation is what it seems to have applied. That's contrary to this court's precedent. But the district court went to the, the basis of. Yes. And the district court contrasted, spent a good bit of time contrasting because of in Title VII and the basis, on the basis of in Title IX. So, of course, the Supreme Court in Bostock used on the basis of eight times to refer to Title VII's but-for causal standard because of. So they used that, that phrase interchangeably. This court also did in the Braidwood management case, describing Bostock's holding, used the phrase on the basis of. So I think the district court's interpretation is contrary to how Congress uses the phrase, the Supreme Court uses the phrase, and how this court used the phrase. On the spending clause issue, it also erred because it, it, it failed to recognize that Davis and Jackson are both Title IX spending clause cases. They set forth the proper analysis. And that is simply whether or not the conduct being alleged is discrimination based on sex. We know discrimination based on sexual orientation entails discrimination based on sex. In fact, defendants in their opening brief, they can't explain how you can discriminate based on sexual orientation without discriminating based on sex. And I think the dictionary definitions that the district court cited at page 15 of its opinion, that's really illuminate, illustrative. The dictionary definitions that the district court cited all define homosexuality in relation to the person's sex and using sex-based terms. That makes sense. When you're talking about sexual orientation discrimination, it's impossible to describe what's happening without relying on or referencing the person's own sex. That's the core insight from Bostock. That, as the, as the Supreme Court put it, sexual orientation inescapably, sexual orientation discrimination inescapably entails discrimination based on sex. The Supreme Court, I thought, also made clear they were not considering Title IX, other statutes that were not before the court in that case. But, of course, no one disputes that the reasoning used by a Supreme Court in a particular case can extend beyond the circumstances of that case. Sure, but how far out ahead of those skis do we need to get? Only the fact that the core insight that discrimination based on sexual orientation necessarily entails discrimination based on sex, that's all this court needs to recognize, applies under Title IX. That insight is not in any way tied to the Title VII context, as the Tenth Circuit recently noted in Fowler. Can we square that circle with the spending clause distinctions, which the Supreme Court has also made? Yes, because under Jackson and Davis, all this court needs to decide is whether or not this conducted issue constitutes intentional discrimination based on sex. If it does, then funding recipients have had sufficient notice that that is conduct that's prohibited under the statute. I think one thing that's— But your argument does not address the determining factor in this case as to what extent the term — assuming the term has sexual connotations, when does it become a litigable cause of action? That's the question here. That's true. And Davis sets forth different factors that someone would need to satisfy. We're only addressing one part of that Davis analysis, which is whether or not it's on the basis of sex. And if I could just make one point, I see my time is up, but if I could make one extra point. Very briefly. Very briefly. I think it's very—it's important to note that in Jackson and Davis, there were circuit splits on whether or not the conducted issue involved discrimination on the basis of sex. And despite the disagreement among the courts of appeals, the court still found in both cases that the conducted issue involved discrimination on the basis of sex. Here we have all authority pointing in the same direction. The Ninth Circuit squarely holding on this issue. Fourth and Seventh on gender identity. The Tenth Circuit holding that Bostock applies beyond Title VII. All the precedents pointing in the same direction. That's stronger than the circuit split that was present in Jackson and Davis. Thank you, Your Honor. Thank you, Your Honor. Morning. May it please the Court. Caleb Kruckenberg for the appellees. Title IX is not a general civility code that awards monetary damages for every instances of teasing or name-calling among schoolchildren. And recognizing the threat to state sovereignty that students—that the students' theory would present here, the district court rightly concluded that there is no federal cause of action for this kind of conduct. It does not mean it's appropriate. But the judgment should be affirmed for three reasons. First, Title IX is not Title VII. Title IX's prohibition of educational discrimination on the basis of sex cannot be stretched so far as to hold schools financially accountable when a student faces bullying that merely includes being called gay on a number of times. Second, any uncertainty in the text has to be read against liability. Even if the statute could bear the weight that the appellant is pushing, at the time of the enactment in 1973, it was certainly not unmistakably clear to the states that they had agreed to accept financial responsibility for the conduct alleged in this case. And third, the name-calling over the course of a month or two—and that's a quote from the district court—that the appellant experienced was not so severe and pervasive as to deny him an opportunity to participate in an equal education. And for any of those three reasons, this Court should affirm the district court's judgment. And I can start, Your Honors, with the Spending Clause issue, but I do want to touch briefly on the textual differences between these two statutes. Because I think there is an important and underappreciated distinction dealing with the motivating factor language. And I'll be honest that Title IX's causation standard is unclear, but the statutes have very different terms that they're using. The problem for you, as I ascertain it, is the Supreme Court equated both of these standards, because when they were describing Title VII in Bostock, they used these terms interchangeably. And, Your Honor, I think there is obviously a difference between using language colloquially or when describing other kinds of laws and making a holding about what the actual scope of the statute is. What they were talking about, though, is a but-for standard of causation. And so, as I ascertain it, you're traveling a whole lot on the word the. Well, it's the and also the lack of the motivating factor language. And I think a lot of our argument is illustrated by the PricewaterhouseCoopers decision from the Supreme Court that predated the statutory amendment to Title VII. That was the plurality decision where the Supreme Court wrestled. What is the causation standard for Title VII? Justice Kennedy, writing for plurality or for three justices, I believe he dissented, he argued for a proximate cause standard in addition to just but-for cause. Ultimately, Congress resolved that issue for Title VII. They said it only needs to be a motivating factor. That is the new language. Congress did not amend Title IX, and motivating factor does not apply to Title IX. And I would argue, and I think that is what the district court was seizing on, is that if we have these two different statutes and one says the basis, and there is the omission of the motivating factor language, that suggests at least something stronger, something closer to proximate causation, something closer to main purpose, however we want to term it. But I think it's also important to remember that in Bostock, the court said, we'll start with the presumption or the premise that sex discrimination is not discrimination on the basis of perceived gender orientation or sexual orientation. It's about, and what the court said specifically, it's not what sex means. It's what the statute says about that. And I think that's where we get into the argument that we made about the subset, where Bostock really talked about discrimination like the kind that the student has alleged here. It is a subset of sex discrimination, but it is not always present, and it is not the primary purpose. I think that is a relevant distinction. But just the fact that there is even an arguable basis or that it is unclear, I think that's when we get into the spending clause issue. Because, again, we don't have to look at what we think about the issue in 2024. The relevant question is what happened at this time of the enactment. What did the Congress and the states understand about the agreement in 1973? That's why we analyze spending clause statutes differently. And I think it's very clear in 1973 that no one would have anticipated this kind of outcome. But what are you arguing about? Are we arguing about because of and based on? The two distinctions are Title VII has because of sex if it is a motivating factor. Title IX says on the basis of sex. That's the difference. And I would assert that putting those two together. I mean, that's the surface distance, the difference. Yes. What is the substantial difference that has an effect in this case? Your Honor, I would argue that it is something closer to proximate causation or main purpose. I think that's how we articulated it in our brief. It's not that it's informed in any small part. And I think. So what you're telling me is that there's confusion about what the term means. Yes. And if there's confusion about what the term means, it seems to me that the consistent thing that the court should do is apply the same meaning to both terms. Normally, that is what we would do. But remember, because this is a spending clause statute, ambiguity. I don't know what the spending clause says. As I understand what you're telling me, the spending clause makes no clear articulation as to the standard. I mean, I agree with you. I mean, if Congress says this, then this is that. I mean, it's what we follow. But you're not telling me that Congress said anything that compels us to differentiate. Well, Your Honor, because this is a spending clause statute, the ambiguity or the uncertainty in that phrase, because of, that counsels against finding liability. And that's what the court insists over and over again, is that because this is not. How do we articulate that then, that the statute counsels against? That doesn't sound like much of a legal ruling to me. Well, Your Honor, this is my terminology, but the court has talked about the need for, I believe they used the phrase, unmistakable clarity in Pennhurst and in Davis and subsequent Title IX cases. And I'll also just point out, as we did in our brief, this court recently, in a number of decisions, in a pair at least, has said, including Texas v. Yellen, has said, if there is a statutory ambiguity that would allow, say, regulatory definitions, rulemaking by the federal government, as the federal government has tried to do here, that enough means it's unclear. But it seems to me that your better argument here is laid in the factual situation of what the statute requires factually and how we should apply it in that committee, instead of arguing over the words on the head of Penn and so on. And, Your Honor, there is no doubt that this court can and perhaps should affirm, based on the severe and pervasive issue, because I think that is very clear. This court's decision in Sanchez and also the Supreme Court's decision in Davis makes it very clear that just calling someone a mean name on a handful of occasions, that's not enough. That's not severe and pervasive. Full power of the federal courts come down on sixth-grade students. I mean, it just sounds like it's kind of improper and it's not the proper place for the courts to be, I mean, to govern the language of sixth graders. That's the teacher's job to do it. And if they don't do it, then they can be fired. That's absolutely correct, Your Honor. And the Davis opinion goes into that precise concern at great length, talking about behavior that might not be appropriate in a workplace, but this is a school and we are dealing with children. There's children. Yes. These are fifth- into sixth-grade situations. They don't act like lawyers. No, they do not. And these are sixth-grade boys who are being ---- But sometimes lawyers act like children. I mean, clearly if there was a case of deliberate indifference and you had severe and pervasive and objectively unreasonable behavior, then there would be an actionable claim. And that sort of brings me to a question I wanted to clarify that I asked counsel opposite. The district court didn't deal with deliberate indifference. Was it properly before the district court so we can look at it?  In your footnote or where did you preserve it? No, Your Honor. So the school district, in its motion for summary judgment, argued that deliberate indifference was also not substantiated on the record, that it should be dismissed for that reason as well. That was briefed below. The district court didn't address it. Instead, it just ruled on these other bases. I mean, I guess the question would be did the school district put it squarely before the district court? Absolutely. That was fully briefed and before the district court. He just found it unnecessary to reach that issue. This court certainly can reach that issue. I mean, it has the entire record. It's the same record that was in front of the district court. It was fully addressed there. Even though it wasn't? Well, it was not. And presented as an issue for this court to resolve. We can present it for the party anyway. This court certainly could rule on that issue. I do want to stress, though, that part of our concern, I think, that has come out in the briefing and I think is illustrated by the fact that the United States is here today and there are obviously significant interests from the states, including I think 22 states have weighed in on this particular case. This is an important and recurring issue about Title IX itself. So certainly my clients are asking for affirmance on whatever basis is appropriate. However, we recognize that if this issue is not resolved, it's likely to recur. There will likely be further litigation. Well, then let's maybe put a period at the end of the sentence on the spending clause issue. I mean, how do you square what the government's argument is? Which is, as I ascertain it, this is very clear. When you apply the language of the statute, no discrimination based on the basis of sex, with Bostock's reasoning and logic and holding in the Title VII context, and when you look at Davis and Jackson, there is no ambiguity. There is no question. There is no question that discrimination based on perceived sexual orientation is on the basis of sex. Therefore, the spending clause issue fails. And, Your Honor, that is— I mean, is that an accurate surmise of what they're saying? I believe so, and I believe the error is that's combining lots of different assumptions. And I think Jackson and Davis, how those decisions address the spending clause question is very informative. Jackson is later of the two. And there the court said—excuse me, Davis, I misspoke. But there the court determined that there was an implied retaliation cause of action. Part of the reasoning that the court employed, and this is something that we argue in our brief, is that everyone understood at the time of Title IX's enactment in 1973 that retaliation is part of discrimination, retaliation claims. And the court specifically said that's from our 1969 decision holding so, and that should have put the states on notice in 1973 when they accepted Title IX, that retaliation comes with the deal. That's very, very different than saying sex discrimination always obviously included discrimination motivated in part, not directly, but in part by animus towards perceived sexual orientation. That is a very, very different kind of a question. And the historical record is unequivocal. The EEOC even said in 1974 that it took the position that Title IX did not encompass the kind of discrimination that's alleged here. And so the idea that the states clearly and unequivocally understood at the time of the enactment, because, again, the Supreme Court in Bennett tells us the only relevant time is the time of the enactment. So if that's what we're looking at and what we're focusing on, then it cannot be the case that the states knew that they were accepting liability for this. And just as a matter of federal power, I think it is critical to understand that the spending clause is different for a reason, because this is not something that the federal government could have done but for this deal, making the deal with the states, because unlike Title VII, which implicates issues of Section 5 of the 14th Amendment and forcibly abrogating state sovereign immunity, Title IX is a deal that says to the states that they will agree to waive their inherent immunity on this issue in exchange for federal funding. But this Court has to ask, what did those parties understand the deal to be? It's not what is possible from the language. And there is a meaningful distinction that the Court rests on time and again when dealing with these kinds of statutes. And I think for that reason, it is very clear that this kind of action would never have been actionable before, and it's constitutionally problematic for us to say to the states, you've come, you've agreed to all of these additional strings, even though nobody anticipated it, not even us. You didn't know, you agreed to it, but you didn't know you agreed to it. Exactly. And that's, I mean, that's how we're talking about this, and that's how the Court talks about these issues time and again. I also just want to point out one factual issue, and I think to the extent that there is any kind of argument about what happened here. I mean, essentially what you're saying, as I understand it, is the law can evolve to cover situations that were not contemplated by Congress to a large extent. But when somebody agrees specifically to the terms of they have to be clearly informed, I mean, that's… Absolutely. And, Your Honor, a very… You're saying you cannot, once you make the contract, you cannot modify the terms of the contract, even though you can modify the terms of the statute if a contract was not involved. Is that what you're saying? Essentially, Your Honor, and I think a good illustration of the distinction comes up in NFIB v. Sebelius, where the Court said there is a notice problem here. And part of what the Court was looking at was a provision of the Affordable Care Act. It was a small provision saying this can be altered or amended by future action. And the Court rejected any kind of idea that that put the states on notice, that they sort of, any change in the law was fair game. And I think that's kind of what we're getting at, is that you can't just tell the states there will be more to come as part of our agreement, and you'll find out when you find out. Are you saying at the same time, implicit in your argument, that whenever you take federal funds, even outside the context of this case, that the federal government can change the terms of that contract, or cannot change the terms of that contract, even though conditions have changed from the time that it was engaged in? I believe that is what the Supreme Court has said, and I believe that is the takeaway. And it's not like Congress has no option here. They could certainly amend Title IX to make it clear that this is now part of the bargain. But what is not appropriate is to say sort of retroactively, well, you should have known. You should have guessed. The contract, segregation meant this when you signed that contract. Segregation means this now 25 years later, even though you don't agree to it. But the law has evolved to that point. I mean, are you saying that the person or the entity that entered the contract 30 years earlier is not bound by the interpretation of those terms subsequently? No. What we're saying is you look at what was reasonably anticipated by the parties to the bargain at the time. And so if that bargain used imprecise language but it was understood at the time it involved concrete action, it is wrong. Our position is that the government cannot then say it also includes other action that you might not have anticipated. But if the contract, not to dig a hole in it, dig a deep hole for myself, but it just seems to me that you're saying that once the contract is entered, the terms of it cannot be changed even if the law changes. No, Your Honor. And Congress always has the option of amending the law. But again, the way we look at a statute like this is different than a different kind of statute. And we have to look at what was, quote, unmistakably clear to the parties of the agreement. And so respectfully, Your Honor, we urge this Court to affirm on any of the bases that we've argued. Thank you. Thank you, counsel. Rebuttal. Thank you, Your Honor. I'd like to make three points. First, I'd like to focus on the word the and the relevant causation standard. The school district has argued that the word the changes the analysis. It does not. Peters, cited at page five of our reply brief, said in the context of the Equal Pay Act, which bars discrimination on the basis of sex, that that uses but-for causation. That's the word the, the same standard that exists here and in Title VII. The word the does work under our reading of the statute because it separates out the but-for cause standard from a weaker standard, like a contributing or a motivating factor standard that's discussed in Nassar. As to the motivating factor standard, this was something that the, that the other side talked about up here. The motivating factor standard does not change the analysis because Bostock expressly said the motivating factor didn't impact the analysis. So that's not at issue here. What is at issue is Title IX using the same but-for cause standard as the background rule for all federal discrimination statutes. The second thing I'd like to focus on is the spending clause. What Jackson says is we have to look at what the words mean, and what they mean is that intentional sex discrimination is prohibited. What do you do with Sebelius? Sebelius doesn't change the analysis at all, and I would point to, for example, Cummings. This is at Penn site number 219, where it implies the exact same type of spending clause analysis that the Supreme Court has used going all the way back to Pennhurst. But you don't dispute that in 1973, 1972, no one involved in this, Congress, the states, people accepting Title VII federal funds, I mean Title IX federal funds, nobody thought about sexual orientation or perceived sexual orientation. This was about, I mean really it was about women in sports or women's programs versus men's programs, right? Correct, and that's why Title IX applies to boys just as it does to girls, even though that wasn't anticipated. The relevant constraining factor that we look to about if there's a clear statement is not the limits of the drafter's imagination, but what the words actually meant. Exactly, but still it does have to be something that people envision. There has to be a clear statement in the statute, and that statement's not there absent Bostock, is it? Yes, absent Bostock, our case would be the exact same, because on the basis of means but for causation, and it is impossible to distinguish between someone for being gay and not gay without discriminating. Where is that clear statement pre-1973? The clear statement of that is what on the basis of sex means, that you change someone from being a boy who likes boys to a girl who likes boys, and that changes. But moreover, I would point to if you're looking to notice, this is from page 21 of the school district's brief when they point to Bennett, that you're looking to what they were on notice of when the grants were made, so to the extent that you are wanting to look to notice, it's the time that the school district accepted the funds for that school year. I see my time has expired. If there are no further questions, we ask this court to reverse and remand. Thank you. Thank you, counsel. The court will take this matter under advisement, and we are adjourned.